

**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 12, 2022**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| RICHARD K. ARCHER and | § | Case No.:  17-20045-RLJ-7 |
| RUTH E. ARCHER, | § | |
| | § | |
| Debtors. | § | |
| _____ | § | _____ |
| | § | |
| KENT RIES, Chapter 7 Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 19-02001 |
| | § | |
| ESTELLE ARCHER, BRANCH T. | § | |
| ARCHER, III, CARAJEAN ARCHER, | § | |
| RICHARD K. ARCHER, JR., NATALIE | § | |
| ARCHER, and ADVANTA IRA TRUST, | § | |
| LLC, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court issues its findings of fact and conclusions of law in this adversary proceeding.

Trial was held April 11–13, 2022 and April 15, 2022.  Upon conclusion of the trial, the matter

was taken under advisement. The Court's findings and conclusions are based upon the record before the Court and are issued under Rule 52 of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

**The Parties**

1. Kent Ries is the trustee of the chapter 7 bankruptcy estate of Richard K. Archer and Ruth E. Archer (the "**Trustee**"). Richard Archer ("**Archer**") and Ruth Archer filed for bankruptcy under chapter 7 of the Bankruptcy Code on February 24, 2017. Archer died shortly before trial.

2. Archer and Ruth Archer had eight children: Elizabeth Archer, Emily Archer, Evelyn Archer, Branch Archer, Eileen Archer, Estelle Archer, Richard Archer Jr., and Rebecca Archer (collectively "**Archer Siblings**").

3. Branch Archer, Estelle Archer, and Richard Archer Jr. are defendants in this case ("**Archer Sibling Defendants**").

4. Branch Archer received a PhD in Physics from the University of California, Berkeley. He later graduated from medical school at the University of Texas Southwestern and became a radiologist. Richard Archer Jr. also graduated from medical school at the University of Texas Southwestern and became a radiologist. Estelle Archer graduated from medical school and became a gynecologist. In total, seven of the eight Archer Siblings became physicians.

5. Branch Archer is married to Carajean Archer, who is also a defendant. Branch Archer has a self-directed IRA with Advanta IRA Trust LLC, which is a defendant. The parties have stipulated that any determination by the Court regarding ownership of the real estate at issue in this proceeding with respect to Branch Archer should apply to Carajean Archer and the IRA.

6.  Richard Archer Jr. is married to Natalie Archer, who is also a defendant.  Richard Archer Jr. has a self-directed IRA with Advanta IRA Trust LLC, which is a defendant.  The parties have stipulated that any determination by the Court regarding ownership of the real estate at issue in this proceeding with respect to Richard Archer Jr. should apply to Natalie Archer and the IRA.

7.  Estelle Archer has a self-directed IRA with Advanta IRA Trust LLC, which is a defendant.  The parties have stipulated that any determination by the Court regarding ownership of the real estate at issue in this proceeding with respect to Estelle Archer should apply to her IRA.  (All defendants collectively referred to as "**Defendants**").

8.  John David Allison ("**David Allison**") married Eileen Archer in 1984 and is Archer's son in law.

9.  At some point in the 1990s, David Allison helped Branch Archer create BTA III Family Holdings, Ltd. Co. ("**BTA III**").  Test. of Branch Archer.  Branch Archer used BTA III to own and manage property.  *Id*.

**The 1988 Deed & Family Farm Agreement**

10. The parties agree that, before 1988, Archer owned about 14 sections of land—not all full sections—in Moore County, Texas that he used to grow crops and raise cattle ("**Moore County Farm**").

11. On March 3, 1988, a warranty deed covering the Moore County Farm was executed (the "**1988 Deed**") by "David Allison, Trustee" granting the Moore County Farm to the Archer Siblings' IRAs for ten dollars.  Pl. Ex. K-1.  The 1988 Deed was signed by "David Allison, Trustee," and notarized.  *Id*.

12. The 1988 Deed was recorded in the Moore County land records on March 17, 1989.  *Id.*

13. David Allison signed the 1988 Deed because Archer asked him to. Test. of David Allison ("**DA**"). David Allison was *not* the trustee of any trust that held title to the Moore County Farm when he signed the 1988 Deed. *Id*. He testified that Archer owned the Moore County Farm at that time. *Id*.

14. Neither Eileen, Branch, Estelle, nor Richard Archer Jr. held IRAs in 1988 that received an interest in the Moore County Farm. *Id.*; Test. of Branch Archer ("**BA**"), Estelle Archer ("**EA**"), and Richard Archer Jr. ("**RAJ**"). And neither Eileen, Branch, Estelle, nor Richard Archer Jr. paid anything in 1988 in connection with the 1988 Deed. Test. of DA, BA, EA, and RAJ.

15. At a time unknown to the Court, but likely near the time the 1988 Deed was signed [Test. of BA], Archer and Ruth Archer entered into a family-farm agreement ("**Family Farm Agreement**") signed by them and six of their children—Emily, Evelyn, Estelle, Eileen, Elizabeth, and Branch Archer. Pl. Ex. K2. The "land" referenced in the Family Farm Agreement is the Moore County Farm. Test. of EA (testifying that she first became aware that she owned property in Moore County when she signed the Family Farm Agreement).

16. The Family Farm Agreement states, "As long as Richard and/or Ruth Archer lives and remains mentally competent, they will manage said property at their sole discretion." Pl. Ex. K-2. It further states, "Richard and/or Ruth will be permitted to operate the farm as they see fit" and "[a]ny and all accounting records will be provided at the sole discretion of Richard and/or Ruth Archer." *Id*. The agreement states that once Archer and Ruth Archer both become unable to operate the farm, a committee of three children will become the managers. *Id*.

**Management of the Moore County Farm Pre-Bankruptcy**

17. From 1988 until 2016, Archer had unquestioned control over the farming operations on the Moore County Farm.  Test. of BA, EA, and RAJ.  While the Archer Siblings were involved with the management of the Moore County Farm to varying degrees, Archer had ultimate authority over the farm.  *Id*.  The Archer Siblings were content with their father managing the farm; they testified that they believed that their father's management of the farm contributed to its appreciation in value over the years.  *Id.*

18. Archer never provided his children with an accounting of the farming operations and never shared profits or lease income with them.  *Id*.  He did pay for the educational and living expenses of his children when they went through medical school, which the Archer Sibling Defendants believe was funded at least partially by the farming operations on the Moore County Farm.  *Id*.

19. For ten years, from 1988 to 1998, the Archer Sibling Defendants received no income directly from the Moore County Farm or paid any expenses on the farm.  *Id*.

20. Beginning in 1998, the United States Department of Agriculture ("**USDA**") made conservation reserve program ("**CRP**") payments to Richard Archer Jr. for sections of the Moore County Farm that were entered into the CRP program, and the USDA continued to make payments into the 2010s.  Defs. Exs. 16, 20, 25, 38; Test. of RAJ.

21. Beginning in at least 2007, farmers who farmed on the Moore County Farm began paying rental payments to Richard Archer Jr.'s IRA, and they continued to make payments until at least 2013.  Defs. Exs. 13, 14; Test. of RAJ.

22. At least during 2008, and likely other years, Invenergy Wd North America LLC paid Richard Archer Jr. lease payments to develop a wind farm on the Moore County Farm.  Defs. Ex. 30; Test. of RAJ.  Richard Archer Jr. negotiated the lease contract with Invenergy.  Test. of RAJ.

23. In 2006 and 2007, Richard Archer Jr. had a bank account for expenses related to the farming operation on the Moore County Farm, and in 2011-2012 he had a revolving line of credit from Wells Fargo for farming expenses.  Defs. Exs. 18, 39; Test. of RAJ.

24. At least in 2005-2008 and 2011, Richard Archer Jr. paid for a variety of farming expenses on the Moore County Farm, including payments for cattle, fuel, equipment repairs, and cattle feed.  Defs. Exs. 15, 31, 33; Test. of RAJ.

25. At least from 2007 through 2012, Richard Archer Jr. made tax payments for the Moore County Farm.  Defs. Exs. 37, 40; Test. of RAJ.

26. Beginning in 1998, the USDA began making CRP payments to Branch Archer for sections of the Moore County Farm that were entered into the CRP program, and the USDA continued to make payments into the 2010s.  Defs. Exs. 45, 70; Test. of BA.

27. Beginning in at least 2006, farmers who farmed on the Moore County Farm began paying rental payments to Branch Archer's IRA, and they continued to make payments until at least 2019.  Defs. Exs. 60, 63; Test. of BA.

28. In 2015, Branch Archer entered into a lease with Apex Clean Energy Inc. for Apex to develop a wind farm on portions of the Moore County Farm.  Defs. Ex. 41; Test. of BA.

29. At least in 2005-2008 and 2012, Branch Archer paid for a variety of farming expenses on the Moore County Farm, including payments for cattle, farm repairs, and seed.  Defs. Exs. 42, 59, 69, 70; Test. of BA.

30. At least in 2012, Branch Archer made tax payments for the Moore County Farm. Defs. Ex. 60 at 000185; Test. of BA. Branch Archer also reimbursed Richard Archer Jr. for tax payments he made on the farm. Test. of RAJ.

31. At least in 2013, Branch Archer paid for an insurance policy on the Moore County Farm. Defs. Ex. 62; Test. of BA.

32. In 2005, Branch Archer purchased farmland adjacent to the Moore County Farm to expand the farming operation. Defs. Ex. 58; Test. of BA.

33. From at least 2007, farmers who farmed on the Moore County Farm began making rental payments to Estelle Archer's IRA, and they continued to make payments until at least 2013. Defs. Ex. 84; Test. of EA.

34. Beginning in 1998, the USDA began to make CRP payments to Estelle Archer for sections of the Moore County Farm that were entered into the CRP program, and the USDA continued to make such payments until 2010. Defs. Exs. 75, 79, 80; Test. of EA.

35. In 2007, Estelle Archer made payments for the purchase and care of cattle to be placed on the Moore County Farm. Defs. Ex. 77; Test. of EA.

36. From at least 2014 through 2018, Estelle Archer paid for an insurance policy on the Moore County Farm. Defs. Ex. 91; Test. of EA.

37. Estelle Archer reimbursed Richard Archer Jr. for tax payments that Richard made on the Moore County Farm. Test. of RAJ.

**The Insurance Fraud**

38. From 2005 through 2017, Archer instructed certain of his children, grandchildren, and farm workers to sign-up as "New Producers" through the Federal Crop Insurance Program to receive favorable crop insurance indemnities for the Moore County Farm that were not otherwise

available to experienced farmers. Test of BA, EA, and RAJ. Under the Federal Crop Insurance Act, an individual may only qualify as a new producer for three years; once one family member had been listed as a new producer for three years, Archer would instruct another family member or farm worker to sign-up as a new producer over the same land. *Id.* Although they held themselves out as New Producers, Estelle Archer, Richard Archer Jr., and BTA III did not exercise "managerial control" over the Moore County Farm. This constituted a fraud against the government. For this, Estelle Archer, Richard Archer Jr., and BTA III were charged with and ultimately convicted of insurance fraud. *Id.*; Pl. Exs. B-4, C-4, D-4.

39. In 2020, Richard Archer Jr. and Estelle Archer were convicted of the misdemeanor offense of theft of public money and aiding and abetting. Pl. Exs. C-6, D-6. In 2020, BTA III— the entity that Branch Archer created for property ownership and related expenses—pleaded guilty to the misdemeanor offense of making false statements to the USDA Federal Crop Insurance Corporation and aiding and abetting. Pl. Ex. B-6.

40. Richard Archer Jr., Estelle Archer, and BTA III collectively received millions of dollars of crop indemnities through the Federal Crop Insurance Program and were required to collectively pay $3.1 million in restitution for their crimes. Test. of BA, EA, and RAJ. The fraudulent crop insurance indemnities constituted a significant portion of the income that the Archer Sibling Defendants received from the Moore County Farm. *Id.*

**Apparent Ownership of the Moore County Farm**

41. In addition to the 1988 Deed, on December 20, 2006, Archer executed a warranty deed purporting to transfer the Moore County Farm to the Archer Sibling Defendants (the "**2006 Deed**"). Pl. Ex. K-3. The grantor was the Richard K. Archer Profit Sharing Trust, and the deed

was signed by "Richard K. Archer, Trustee." *Id*. The 2006 Deed was recorded in Moore County on April 10, 2007. *Id*.

42. On April 23, 2014, Archer executed three quit claim deeds purporting to transfer the Moore County Farm to the IRAs of the Archer Sibling Defendants (the "**2014 Deeds**"). Pl. Exs. K-4, K-5, K-6. The grantor was the Richard K Archer MDPA Profit Sharing Plan, and the deed was signed by "Richard K. Archer" as trustee. *Id*. The 2014 Deeds were recorded in the Moore County land records on May 14, 2014. *Id*.

43. Through a series of deeds, the other Archer Siblings transferred their respective interests in the Moore County Farm to the Archer Sibling Defendants. Test. of BA, EA, and RAJ. The Archer Sibling Defendants never paid or provided any consideration for these transfers. *Id*.

44. At some point, the Archer Sibling Defendants' interests in the Moore County Farm were transferred to their self-directed IRAs. *Id*. Beneficiaries of self-directed IRAs are not allowed to transfer their own real property into their IRAs, and the Archer Sibling Defendants testified that they do not know how their interests in the Moore County Farm were transferred to their IRAs. *Id*.

**The Randall County Farm**

45. On August 26, 2008, Richard Archer Jr. purchased 670 acres of land in Randall County, Texas ("**Randall County Farm**") from Lamb Agri, LLC. Pl. Ex. K-7; Test. of RAJ. Archer owned Lamb Agri and was its director when Richard Archer Jr. purchased the Randall County Farm. Test. of RAJ.

46. The deed for the Randall County Farm (the "**2008 Deed**") was recorded two days after its execution, on August 28, 2008. Pl. Ex. K-7.

47. Richard Archer Jr. obtained a $1 million loan from Panhandle Plains Land Bank and, according to his testimony, paid $1.3 million to Archer for the purchase of the Randall County Farm. Test. of RAJ.

48. Shortly after Richard Archer Jr. paid Archer the $1.3 million, Archer paid back to Richard Archer Jr. a sum of at least $500,000. *Id*. Richard Archer Jr. used the funds to make improvements on his home in Amarillo. *Id*.

49. Before and after the sale of the Randall County Farm in 2008, Archer had primary authority over the farming operations on the land. *Id*. Richard Archer Jr. was content with his father managing the farm as, per his testimony, he believed it enhanced the land's value. *Id*.

50. During the time that Archer managed the Randall County Farm, he never provided Richard Archer Jr. with an accounting of the farming operations and never directly paid him any profits or lease revenue. *Id*.

51. In 2008, Richard Archer Jr. entered into a conservation plan with the USDA to preserve parts of the Randall County Farm. Defs. Ex. 23; Test. of RAJ. The agreement was negotiated by Richard Archer Jr.; under the agreement, certain parts of the Randall County Farm that were declared highly erodible were removed from agricultural production. Defs. Ex. 23; Test. of RAJ.

52. In 2008, the USDA made CRP payments to Richard Archer Jr. for parts of the Randall County Farm. Defs. Ex. 20; Test. of RAJ.

53. Richard Archer Jr. paid for cattle, equipment, seed, and other farm products that were used for Archer's farming operations. Test. of RAJ. Archer managed the farming operations on the Moore County Farm, Randall County Farm, and other land owned by the Archer Siblings and Archer; the different parcels were all managed collectively as one operation. Test. of RAJ, BA,

and EA. It is therefore probable that some farm expenses incurred by Richard Archer Jr. were for operations on the Randall County Farm.

**The Bankruptcy and this Adversary Proceeding**

54. In 2011, a man named Bobby Tunnell was driving a vehicle and hit a cow owned by Archer. Tunnell suffered serious injuries as a result. Test. of Dean Boyd, Bobby Tunnel's Attorney. Tunnell sued Archer and, on January 27, 2017, received a judgment against Archer for $8.95 million. Pl. Ex. P-1.

55. A month later, on February 24, 2017, Archer and Ruth Archer filed for bankruptcy under chapter 7 of the Bankruptcy Code.

56. On February 21, 2019, the Trustee filed this adversary proceeding; he seeks a declaration from the Court that both the Moore County and Randall County Farms are not owned by the Defendants but are properties of Archer's bankruptcy estate.

**The Parties' Stipulation of Legal Title**

57. By the Joint Pretrial Order, the parties

> stipulate that legal title to the Moore county land at issue in this proceeding, specifically the fourteen (14) whole or partial sections of land identified in the Plaintiffs Original Complaint (i.e. those remaining after this Court's Order on Defendant's Motion for Partial Summary Judgement), is vested in the name of the Defendants. Therefore, the parties agree that no proof is necessary regarding which Defendants have title to any specific section of land, as all the land is presumed to be titled in the name of the Defendants. This stipulation is intended by the parties to greatly simplify the trial of this proceeding by focusing the trial on whether the Plaintiff or Defendants actually own the Moore county land without the need for substantial testimony and documents as to how all the deeds to the land over the past thirty four years effected apparent title to the land among all the parties and non-parties.

ECF No. 78 at 4 (the "**Title Stipulation**").[1]

---

[1] "ECF No." hereinafter refers to the numbered docket entries in this adversary proceeding, No. 19-02001.

## CONCLUSIONS OF LAW

**Contentions of the Trustee and Relief Sought**

1.   The Trustee argues that the Moore and Randall County Farms were never properly transferred from Archer to the Defendants.  Concerning the Moore County Farm, he contends (1) that the 1988 Deed is, for several reasons, void, and (2) that Archer never intended to deliver the 1988 Deed (or other deed) to the Archer Siblings.  Similarly, for the Randall County Farm, the Trustee pleaded that the 2008 Deed is void for lack of a grantor and that Archer lacked intent to deliver the 2008 Deed to Richard Archer Jr.  Based on these deficiencies, the Trustee argues that when Archer filed bankruptcy, the Moore and Randall County Farms were not the Defendants' properties but were, instead, Archer's and should therefore be declared to be property of the bankruptcy estate.  *See* 11 U.S.C. § 541(a)(1).  The Trustee seeks a judgment to this effect.  He asks for an order from the Court that directs the Defendants to sign-over their purported interests in the Moore and Randall County Farms to the bankruptcy estate under the Court's turnover powers of 11 U.S.C. § 542 or § 543.  The Trustee also seeks turnover relief under his causes for constructive trust and trespass to title.

**Jurisdiction**

2.   This action ultimately concerns whether the Moore and Randall County Farms should be declared to be property of the bankruptcy estate and administered by the Trustee for the benefit of the estate's creditors.  *See* 11 U.S.C. § 541(a)(1).  It therefore arises both under the Bankruptcy Code and in this chapter 7 case.  *See* 28 U.S.C. § 1334(b).  The Court concludes this is a core proceeding.  28 U.S.C. § 157(b)(2)(A) and (E).  In addition, the parties consented to the Court's entry of final orders.  Joint Pretrial Order § F.1 [ECF No. 78].

**The Title Stipulation**

3.   The Title Stipulation provides for the Moore County Farm as follows: (i) that legal title to the Moore County Farm is vested in the name of the Defendants; (ii) that no proof is necessary to determine which Defendant or Defendants are reflected as title holders to the various tracts within the farm; (iii) that the entire farm is presumed to be titled in the Defendants' names collectively; and (iv) that the purpose of the stipulation is to simplify the trial by focusing on whether the plaintiff, the Trustee (on behalf of the bankruptcy estate), or the Defendants actually own the Moore County Farm—and that evidence of the various transactions among the Archer family and how they "effected apparent title" is unnecessary.  *Id*. at 4.

4.   The two legal theories advanced by the Trustee in this proceeding are (1) that the 1988 Deed was ineffective and void, and (2) that Archer lacked the intent to deliver the 1988 Deed to the Archer Siblings.  A void deed passes *no title* whatsoever to the purchaser.  *Wood v. HSBC Bank USA, N.A.*, 505 S.W.3d 542, 549 (Tex. 2016).  And delivery of a deed is essential to the granting of *legal* title to the transferee.  *Maayeh v. Curry*, No. 05-19-01466-CV, 2022 WL 1089913, at *3 (Tex. App.—Dallas Apr. 12, 2022, no pet. h.).

5.   The parties contend that all issues in this case relate to whether Archer held *equitable* title to the Moore County Farm.  Pl. Trial Br. at 3–4, ECF No. 71; Defs. Trial Br. at 4–5, ECF No. 73. The Court does not, however, construe this contention to concern equitable title as defined under Texas law.  "Equitable title is defined as 'a right, enforceable in equity, to have the legal title to real estate transferred to the owner of the right upon the performance of specific conditions.'" *Glenn v. Lucas*, 376 S.W.3d 268, 276 (Tex. App.—Texarkana 2012, no pet.) (quoting *City of Houston v. Guthrie*, 332 S.W.3d 578, 588 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). Equitable title without legal title is the interest commonly held by a mortgagee or a parent

company of a title-holding subsidiary. *See Flag-Redfern Oil Co. v. Humble Expl. Co., Inc.*, 744 S.W.2d 6, 8 (Tex. 1987); *TRQ Captain's Landing L.P. v. Galveston Cent. Appraisal Dist.*, 212 S.W.3d 726, 732 (Tex. App.—Houston [1st Dist.] 2006), *aff'd*, 423 S.W.3d 374 (Tex. 2014). There is no mortgagor-mortgagee or parent-subsidiary relationship here. Neither party pleaded, presented evidence, or argued that Archer had a right to obtain legal title to the Moore County Farm from the Defendants upon performance of some condition.

6.    The parties are construing the ultimate right of ownership to require that the owner hold both the legal and equitable interests in the farm—the legal interest constituting record title and the equitable interest constituting the rights of use and enjoyment of the property. Their stipulation of legal title (or stated otherwise, apparent title) in the Title Stipulation assumes that all other rights in the bundle of rights of land ownership concern the equitable interest in the property. This bears some consistency with § 541(a)(1) of the Bankruptcy Code, which generally defines estate property to be all "legal or equitable interests" of the debtor in property.

7.    The Court accepts the Title Stipulation of the parties. Their statement that *legal title* to the Moore County Farm is vested in the name of the Defendants refers to their apparent ownership interest as opposed to a beneficial interest in the farm. A review of the real estate records of Moore County would, according to the Title Stipulation, reveal that the Defendants are the record title holders.

8.    The parties agree that the 1988 Deed and the Family Farm Agreement are the primary documents that reflect whether Archer, *in 1988*, intended to make a gift of the Moore County Farm to his children.

14

**Effective Conveyance of Real Property**

9.  "A conveyance [of real property] is effective and title is transferred when the following has occurred: (1) execution of the deed, and (2) delivery of the deed."  *Maayeh*, 2022 WL 1089913, at *3.  A properly executed deed has four essential characteristics:

> (1) a grantor and grantee can be ascertained from the instrument as a whole;
> (2) there are operative words of grant showing the grantor's intention to convey to the grantee title to a real property interest;
> (3) the property is sufficiently described; and
> (4) the instrument is signed and acknowledged by the grantor.

*Cohen v. Tour Partners, Ltd.*, No. 01-15-00705-CV, 2017 WL 1528776, at *6 (Tex. App.— Houston [1st Dist.] Apr. 27, 2017, no pet.).

10.  "Two elements must be established to prove delivery of a deed: (1) the deed must be delivered into the control of the grantee, and (2) the grantor must intend the deed to become operative as a conveyance."  *Maayeh*, 2022 WL 1089913, at *3.  Here, neither the Trustee nor the Defendants question the first element of delivery—that the 1988 Deed (and other deeds conveying the Moore County Farm) were physically delivered to the Archer Siblings.  The Title Stipulation likewise implies actual delivery of the 1988 Deed (and other deeds).  The Trustee, instead, argues that the second element is not met—that despite the physical transfer of the document, Archer never intended for the deed to operate as a conveyance.

> The question whether a deed has been delivered is primarily one of the grantor's intent. Without the required grantor's intent, the manual delivery of the deed to the grantee does not pass title. The intent of the grantor is determined by examining all the facts and circumstances preceding, attending, and following the execution of the deed.

*Maayeh*, 2022 WL 1089913, at *3 (internal citations omitted).

**Validity of 1988 Deed**

11. The Trustee contends that the 1988 Deed is void for lack of a grantor and grantee. The Defendants objected to the Court's consideration of whether the 1988 Deed is void. The void-deed theory was raised by the Trustee for the first time in the Pretrial Order. The Court does not, however, need to decide if the 1988 Deed is void, as contended by the Trustee. The Title Stipulation provides that the Defendants are the record title holders. The Court accepts such stipulation as proof, as between the parties, of the Defendants' holding apparent title to the Moore County Farm.

12. The 1988 Deed, as the parties acknowledged, does not reflect that the Moore County Farm was conveyed by Archer to any or all of the Archer Siblings. *See* Findings of Fact 11–14. But given the Title Stipulation, the parties have agreed that *some* deed (or series of deeds) was effective to pass apparent title regardless whether the 1988 Deed was improperly executed or is void. When considered in conjunction with the Family Farm Agreement, the 1988 Deed is, at most, some evidence of Archer's intent to convey the farm to his children.

13. Even if the Court were to entertain the void-deed issue and find that the 1988 Deed is void, such finding would not, itself, as the Trustee contends, establish that the Moore County Farm remained Archer's property and thus became estate property. The 2006 and 2014 Deeds *also* purport to transfer title to the Archer Sibling Defendants. *See* Findings of Fact 41–42. The effect of the Title Stipulation and the import of these other deeds subsume any effect of a determination that the 1988 Deed is void.

**Archer's Intent to Convey the Moore County Farm**

14. The Trustee argues that even if the 1988 Deed was valid, ownership of the Moore County Farm never passed to the Defendants because Archer never intended the 1988 Deed (or any other deed) to serve as effective conveyance of the Moore County Farm.

15. Ordinarily, when a grantor gifts property, as occurred here, the burden is on the grantee to prove donative intent. *Woodworth v. Cortez*, 660 S.W.2d 561, 564 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.). There are two circumstances relevant here, however, where donative intent may be presumed: (1) when a grantor records a deed, and (2) when a grantor executes a deed transferring property to his children. *Lathe v. Lathe*, No. 01-18-00936-CV, 2020 WL 4118021, at *4 (Tex. App.—Houston [1st Dist.] July 21, 2020, no pet.); *Richardson v. Laney*, 911 S.W.2d 489, 492 (Tex. App.—Texarkana 1995, no writ). The 1988 Deed was recorded, as were other subsequent deeds transferring land to and among the Archer Siblings. *See, e.g.*, Pl. Exs. K-1, K-3, K-4, K-5, K-6. The Title Stipulation also establishes the presumption of donative intent—as apparent title holders, the Defendants are donees of record. The testimony of the witnesses at trial clearly establishes that Archer was the ultimate grantor of any gift of the Moore County Farm to the Archer Siblings.

16. Both presumptions of donative intent apply. A party may rebut a presumption of intent by showing: "(1) that the deed was delivered or recorded for a different purpose, (2) that fraud, accident, or mistake accompanied the delivery or recording, or (3) that the grantor had no intention of divesting himself of title." *Maayeh*, 2022 WL 1089913, at *3 (quoting *Stephens Cnty. Museum, Inc. v. Swenson*, 517 S.W.2d 257, 262 (Tex. 1974)). Rebutting the presumption of parental intent requires clear and convincing evidence. *Richardson*, 911 S.W.2d at 492. "Clear and convincing evidence is defined as that measure or degree of proof which will produce

17

in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

17. From 1988 until Archer filed bankruptcy in 2017, he exercised primary authority over the management of the Moore County Farm. Since the Archer Sibling Defendants did not begin paying property taxes on the land until the 2000s, Archer presumably paid the taxes on the land before then. Although the Family Farm Agreement directed Archer to divide profits from the farm among his children, he never made rent or profit payments derived from the farming operations. In sum, Archer retained significant benefits and burdens of ownership over the Moore County Farm.

18. A grantor retaining possession of a property is evidence that the grantor did not intend to deliver the deed of the property to a grantee. *See Thornton v. Rains*, 157 Tex. 65, 69, 299 S.W.2d 287, 289 (1957); *RBS Mortg., LLC v. Gonzalez*, No. 04-11-00681-CV, 2013 WL 749730, at *5 (Tex. App.—San Antonio Feb. 27, 2013, no pet.). While persuasive, such evidence does not conclusively establish lack of intent, especially where the grantee shares possession of the property. *Woodworth*, 660 S.W.2d at 564 ("While possession of the property is essential in order for the gift to ripen into title, it need not be exclusive possession."); *see also Paull & Partners Invs., LLC v. Berry*, 558 S.W.3d 802, 811 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Killingsworth v. Denman (In re Killingsworth)*, No. 08-32007-SGJ-7, 2014 WL 6389931, at *7 (Bankr. N.D. Tex. Nov. 14, 2014).

19. Here, the Archer Sibling Defendants shared significant responsibilities of ownership over the Moore County Farm with their father. The Archer Sibling Defendants paid property taxes on the land, paid for insurance covering the land, negotiated lease contracts with wind and solar energy companies to develop on the land, collected rent payments from the wind and solar

energy companies, paid farm expenses, purchased cattle, collected CRP payments, and received rent payments from farmers on the land. These activities lasted for years, starting in the late 1990s until the present. The Archer Sibling Defendants also testified that they were content with their father farming the Moore County Farm and retaining income off the farm because it gave him a healthy endeavor to pursue later in life and because his activities contributed to the land's appreciation in value. In sum, the Archer Sibling Defendants shared significant responsibilities over the Moore County Farm with their father; the evidence presented at trial that Archer retained control over the Moore County Farm after 1988 is not sufficient alone to rebut the presumption of donative intent.

20. The Trustee argues that Archer and the Archer Sibling Defendants, from the outset and continuing through the years, acted in concert to perpetuate a fraudulent scheme as evidenced by their new-producer fraud scheme. The gift of the Moore County Farm was never intended to be a real conveyance, according to the Trustee. The Archer Sibling Defendants admit that they received crop insurance indemnities on account of their fraud and that their feigned new-producer status was directed by Archer. Their illegal conduct, however, occurred several years *after* the farm was presumptively gifted to them. And their legitimate activities concerning the farm—such as with the CRP program and energy leases—bore no relation to the insurance scam. The Archer Sibling Defendants' fraud lasted for three years each, as that was the length of time they could receive new-producer status. But each of their involvement on the land spanned decades and occurred both before and after their insurance fraud. Archer's purpose in transferring the farm to his children when he did is unclear. But such a gift—by a parent to his children—is certainly not unusual. The evidence is not sufficient to support a conclusion that

19

Archer intended to place legal title to the Moore County Farm in the name of the Archer Sibling

Defendants as part of a plan to defraud the government.

21. The Trustee has failed to show through clear and convincing evidence, or even by a

preponderance of the evidence, that Archer did not intend to transfer ownership of the Moore

County Farm to the Archer Sibling Defendants. The evidence that Archer retained control over

the land and recruited the Archer Sibling Defendants to perpetuate a fraud does raise doubts as to

his intent to transfer the 1988 Deed—or any other deed—to his children. But the Archer Sibling

Defendants' involvement with the land before and after the fraud and their comfort with their

father's control is convincing evidence that their father did intend to transfer ownership detached

from his intent to perpetuate fraud. The Court concludes that Archer had the requisite intent to

deliver the deeds and convey the Moore County Farm to the Archer Sibling Defendants.

**Conveyance of the Randall County Farm**

22. The Trustee contends the 2008 Deed is void for lack of a grantor, and title to the Randall

County Farm therefore never passed from Archer to Richard Archer Jr. This argument was only

raised in the complaint, however, and no evidence was presented on the point. The 2008 Deed

satisfies the elements of a valid deed: the deed lists Lamb Agri, LLC as the grantor and Richard

Archer Jr. as the grantee; the language of the instrument clearly evinces intent to transfer

ownership to Richard Archer Jr.; it describes the Randall County Farm; and it was signed by

Archer, owner of Lamb Agri. Accordingly, the Trustee failed to prove that the 2008 Deed is

void or was improperly executed.

23. The Trustee does not contest whether the 2008 Deed was properly executed but contends

ownership of the Randall County Farm never passed to Richard Archer Jr. because Archer never

delivered the 2008 Deed to him. *See* Conclusion of Law 10. The 2008 Deed is recorded and

purports to transfer the Randall County Farm from Lamb Agri, LLC, which was owned and controlled by Archer, to Richard Archer Jr.

24. Richard Archer Jr. took out a $1 million loan and paid an additional $300,000 for the Randall County Farm. Test. of RAJ; Def. Ex. 22. However, after he paid $1.3 million to Archer, Archer immediately returned at least $500,000, perhaps more, to Richard Archer Jr., which he used for home improvements.[2] The Trustee contends the deal was irregular and improper. One could perhaps argue that the land sale was a tool for Richard Archer Jr. to obtain funds for improvements to his home and thus not truly an actual transfer of ownership of the property. This possibility is bolstered by the fact that Archer continued to manage the Randall County Farm after the sale.

25. But Richard Archer Jr. did not receive the entirety of his loan back from Archer— assuming the low end of the range, Archer presumably retained close to $800,000 from the sale.[3] Plus, there is no evidence that Richard Archer Jr. needed to feign a land purchase to obtain a loan for home improvements—that is, there is no evidence he could not have obtained a loan through traditional means. It is farfetched to conclude that Richard Archer Jr. would expend several hundred thousand dollars as a way to get another $500,000 for home improvements. Rather, the evidence suggests that Archer intended to sell the Randall County Farm for less than the stated price of $1.3 million and that Richard Archer Jr. manipulated the sale out of convenience to obtain funds for a purpose—home improvements—unrelated to the Randall County Farm. That Richard Archer Jr. independently negotiated a conservation plan with the USDA for the Randall County Farm, received CRP payments, and paid expenses on the farm further indicate that he

---

[2] Richard Archer Jr. testified that the amount paid back to him was between $500,000 to $1,000,000 but closer to the low end of the range.
[3] *See supra* note 3.

was (and is) the true owner of the land.  The Court concludes that Archer had the requisite intent to properly deliver the 2008 Deed and to convey the Randall County Farm to Richard Archer Jr.

**Attorney's Fees**

26. The Defendants assert that they are entitled to attorney's fees based on the Trustee's claim for declaratory judgment.  In federal court, "[s]tate law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).  While the Trustee pleaded a claim for declaratory judgment, "[a] trespass-to-try-title action is the exclusive method for determining title to real property." *King Operating Corp. v. Double Eagle Andrews, LLC*, 634 S.W.3d 483, 494 (Tex. App.—Eastland 2021, no pet.) (citing Tex. Prop. Code Ann. § 22.001(a) (West 2014)).  "[W]hen a party has satisfied the pleading requirements for a claim for trespass to try title, [courts] disregard 'other variations' and treat 'any suit to establish title to land as a trespass-to-try title action.'" *Id*. (quoting *Brumley v. McDuff*, 616 S.W.3d 826, 832 (Tex. 2021)).  Along with his claim for declaratory judgment, the Trustee also pleaded a claim for trespass to try title, which is the proper claim for the Trustee's requested relief of title to and possession of the properties at issue.  Accordingly, the Court will determine the Defendants' entitlement to attorney's fees based solely on the Trustee's trespass-to-try-title claim. *See id*. (basing attorney's fees solely on trespass-to-try-title claim when party brought trespass-to-try-title and declaratory-judgment claims).  As "attorney's fees are not recoverable on a trespass-to-try-title claim," the Court denies the Defendants' request for attorney's fees. *Id*.

**Conclusion**

27. The issues here raise mixed questions of fact and law.  Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

28. The parties stipulated that Archer conveyed apparent title to the Archer Sibling Defendants.  The Title Stipulation and other evidence establish that Archer intended to convey the Moore County Farm to his children and the Randall County Farm to Richard Archer Jr.  Delivery of title was therefore effective.  This does not mean that the Defendants necessarily hold clear title to the Moore and Randall County Farms; no evidence showing the complete chain of title before or after the execution of the 1988 and 2008 Deeds was presented to the Court.  Regardless, each of the Trustee's claims rest on the contention that Archer did not legally deliver the 1988 and 2008 Deeds to the Archer Siblings.  The Court concludes, however, that Archer did deliver the deeds and did so with intent to effect conveyance of both farms.  The Court holds that both farms are not property of the bankruptcy estate.  The Trustee's causes of action and requested forms of relief must therefore be denied.

### End of Findings of Fact and Conclusions of Law ###